In the Matter of the WELFARE OF the CHILDREN OF A.I. (Deceased) and M. I., Parents.

No. A09–1818.

Court of Appeals of Minnesota.

March 16, 2010.

William Ward, Fourth District Chief Public Defender, Peter W. Gorman, Assistant Public Defender, Minneapolis, MN, for appellant M.I.

Michael O. Freeman, Hennepin County Attorney, Mary M. Lynch, Cory A. Carlson, Assistant County Attorneys, Minneapolis, MN, for respondent Hennepin County.

Rebecca A. Paulzine, Bruce G. Jones, Faegre & Benson LLP, Minneapolis, MN, for respondent, Patricia Timpane, Guardian ad Litem Program.

Considered and decided by HALBROOKS, Presiding Judge; SCHELLHAS, Judge; and CRIPPEN, Judge.

## OPINION

CRIPPEN, Judge.*

On appeal from an order terminating his parental rights, appellant argues that respondent impermissibly based its decision solely on the fact of his incarceration as proof that he is palpably unfit, and raises other arguments about the propriety of the proceedings in the district court. Because we conclude that appellant's act of murdering the children's mother, resulting in a prison sentence longer than the children's remaining age of minority, satisfies the statutory definition of palpable unfitness, and because none of appellant's other arguments raise grounds for reversal, we affirm.

## FACTS

Appellant M.I. and his wife A.I. were both originally from Nigeria and were married there in 2003. They moved to Minnesota in 2004, where appellant had previously lived during two earlier marriages. Appellant and A.I. had two children: M.U.I., age 5 in April 2010, and C.O.I., age 4 in June. The couple separated in 2007 and continued to share custody of the children. On July 24, 2008, evidently due to a belief that his wife had been unfaithful, appellant went to her workplace and repeatedly shot her, resulting in her death. Appellant immediately admitted what he had done, stating that he "killed the woman that mess[ed][his] life up." He was convicted of second-degree murder and sentenced to 367 months (31.33 years) in prison.

Appellant was taken into custody on the day of the murder, and the children were given protective care. Five days later, respondent petitioned to terminate appellant's parental rights citing two statutory grounds for termination: abandonment and palpable unfitness. The petition stated that termination of parental rights was in the children's best interests because returning them to either parent was "not possible."

The court transferred custody of the children to respondent on an emergency basis and ordered out-of-home placement. The children were initially placed with relatives who subsequently asked respondent to find another home for them. The children were then placed in non-relative, temporary, foster care. After a permanency hearing in February 2009, the district court indicated that transfer of permanent physical and legal custody to a relative was the only permanency option besides termination of parental rights, and noted that respondent was investigating a maternal relative in Maryland and the maternal grandparents in Nigeria.

At a pre-trial hearing later in March, respondent also identified C.O., appellant's sister in Nigeria, as a possibility for transfer of legal custody. The court expressed concern about the logistics of transfers to distant places, and its order directed respondent to continue exploring C.O. and to submit a "practical and logistically detailed plan" addressing transfer of custody to a relative.

At trial on the termination petition in June, the documentary record consisted entirely of appellant's pre-sentence investigation (PSI) from the murder conviction and the warrant of commitment sentencing him for the crime. The PSI provided an

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

account of the murder and detailed appellant's family history in both Nigeria and the United States, including two previous marriages during which he lived in Minnesota. The PSI stated that the murder of A.I. showed "his complete disregard for the lives of his victims, his children, and their families."

Respondent's social worker and the appointed guardian ad litem testified at the termination trial. They discussed the children, stated that they were doing well in foster care, and offered the conclusion that termination is in the children's best interests. Respondent stated that it had been unable to complete a home study or its equivalent for C.O.'s home in Nigeria, despite receiving some assurances from her. The home-study results for the relative in Maryland were still pending when the trial was held.

Appellant provided a sworn statement at trial, focusing then on his desire for the children to be raised by his sister in Nigeria. He vouched for her, pledged the resources of his family, and stated that the social worker had not made serious efforts to consider placement with his sister. He said he would voluntarily terminate his parental rights if adoption by his sister were assured. He did not discuss his history with A.I. or the murder, other than to say that he had never abused anyone, and to suggest that his family and A.I.'s family in Nigeria had concluded he had not done anything wrong.

In an order issued July 20, 2009, the district court stated that "it may appear that [appellant] is palpably unfit" but that respondent had impermissibly "relied solely upon [appellant's] incarceration" and "should have presented evidence including [appellant's] violent history." It found grounds for termination had not been es-

tablished. But the court also recognized that "the children remain without a permanent home" and ordered a new trial for the parties to present further evidence.

On July 30, respondent moved for amended findings or, alternatively, for the court to re-open the hearing. Appellant filed a motion challenging the district court's authority to order a new trial, arguing that it had been improper for the court to give respondent a second chance to prove its case, particularly by indicating the nature of proof that might establish grounds for termination.

Without further argument, evidence, or hearing, the district court granted respondent's motion and amended its July order. Two new findings were added: a quotation from the PSI that appellant "killed his wife . . . when there was an active restraining order in place," and a finding that in his statement to the court he "expressed no responsibility or remorse for his actions or their effect on his children." [1] The order's amended conclusions of law found that appellant's palpable unfitness had been established by clear and convincing evidence and that termination of his parental rights is in the children's best interests. The district court ordered termination of appellant's parental rights to both children.

Appellant argues that his parental rights were impermissibly terminated for palpable unfitness under Minn.Stat. § 260C.301, subd. 1(b)(4) (2008), based solely on the fact of his incarceration. He also challenges the actions taken by the district court to re-visit the termination after its July order; the failure to transfer legal custody of the children to his sister; and the sufficiency of the evidence to support termination of his parental rights.

---

1. The findings also add an additional paragraph stating that "the requirements of U.S. Public Law 96–272, Section 472(a) are met." The law relates to federal adoption assistance and is not relevant to this appeal.

## ISSUES

1. Is the statutory definition of palpable unfitness in Minn.Stat. § 260C.301, subd. 1(b)(4) satisfied by the evidence and the district court's findings?

2. Do any of appellant's other claimed errors require reversal of the district court's order terminating his parental rights?

## ANALYSIS

■ This court reviews termination of parental rights to determine "whether the trial court's findings address the statutory criteria, whether those findings are supported by substantial evidence, and whether those findings are clearly erroneous." *In re Welfare of M.D.O.*, 462 N.W.2d 370, 375 (Minn.1990). The sufficiency of the evidence must be closely examined to determine whether it was clear and convincing. *In re Children of T.A.A.*, 702 N.W.2d 703, 708 (Minn.2005). The district court's conclusions are entitled to considerable deference. *In re Welfare of Children of S.E.P.*, 744 N.W.2d 381, 385 (Minn.2008). Interpretation of the applicable statute is a question of law that we review de novo. *In re Welfare of Child of T.P.*, 747 N.W.2d 356, 360 (Minn.2008).

## 1.

Central to the district court's termination of parental rights in this case is the extent to which the nature of a criminal act resulting in a parent's incarceration is sufficient to establish grounds for termination of parental rights. Litigation and resolution of this case was prolonged because the parties and the district court reasonably struggled with whether appellant's act of murdering A.I., and its consequences, was sufficient to support termination of his rights. Murder of one parent by the other presents unique challenges in application of the statutory provision at issue.

The fourth of nine statutory grounds for termination of rights rests on a conclusion that the parent is "palpably unfit to be a party to the parent and child relationship." Minn.Stat. § 260C.301, subd. 1(b)(4). A parent's unfitness is based on showing either "a consistent pattern of specific conduct before the child" or "specific conditions directly relating to the parent and child relationship." *Id.* Either finding must be "determined by the court to be of a duration or nature that renders the parent unable, for the reasonably foreseeable future, to care appropriately for the ongoing physical, mental, or emotional needs of the child." *Id.*

"When the words of a law in their application to an existing situation are clear and free from all ambiguity, the letter of the law shall not be disregarded." Minn.Stat. § 645.16 (2008); *see also Beardsley v. Garcia*, 753 N.W.2d 735, 737 (Minn.2008) (stating that language must be given effect when it is plain and unambiguous). Statutory construction is a question of law, reviewed de novo. *Goodman v. Best Buy, Inc.*, 777 N.W.2d 755, 758 (Minn.2010).

The first part of the definition in subdivision 1(b)(4) requires one of two preliminary showings: a consistent pattern of specific conduct before the child, or specific conditions directly relating to the parent and child relationship. A consistent pattern of conduct, by definition, may not be established by a single act. However, the nature and direct consequences of the murder can suffice to establish "specific conditions directly relating to the parent and child relationship." The record indicates that the parents shared custody before the murder, and as a result, the murdering parent has received a sentence for the murder that will result in an incarceration exceeding the children's remaining minority. The conditions thus established are fundamental to the parent and child

relationship: the children, who had previously been cared for by both parents, now face daily life without either parent during the entire period of their minority. A parent convicted of an intentional murder of the other parent is necessarily accountable for willfully creating this condition.

The second part of the statutory definition provides that the condition must be "of a duration or nature that renders the parent unable, for the reasonably foreseeable future, to care appropriately for the ongoing physical, mental, or emotional needs of the child." Minn.Stat. § 260C.301(b)(4). This definition is satisfied by the inherent consequences of the murder itself.[2] The condition that the murdering parent has created is the long-term absence of both parents.

Incarceration alone does not necessarily preclude a person from acting in a parental role. *See In re Welfare of Staat,* 287 Minn. 501, 507, 178 N.W.2d 709, 713 (1970) (stating that termination is unwarranted for incarcerated parent who maintains parenting role while in prison); *see also M.D.O.,* 462 N.W.2d at 378–79 (affirming district court's denial of termination for mother incarcerated for murdering child, based on mother's continued relationship with child at issue and amenability to services while incarcerated). But neither is incarceration irrelevant; it plainly creates challenges and necessarily decreases an incarcerated person's capacity to provide for day-to-day needs.

■ For an incarcerated surviving parent, it therefore becomes infinitely more important to preserve and nurture the resources available outside of prison, such as family members or other caregivers. *See M.D.O.,* 462 N.W.2d at 379 (noting that child was in custody of other parent and that incarcerated parent maintained contact and visitation). Appellant, who is not merely incarcerated, but incarcerated for murdering the other parent, has not only decreased his own capacity to parent, he has also destroyed the other primary resource that could have helped compensate for his absence. Appellant has eliminated parenting critical to the well-being of his children, and this in and of itself reflects an inability to understand or meet the children's needs. When a parent permanently and intentionally denies his children parental care under the circumstances present in this case, he demonstrates his palpable unfitness to parent.

We are mindful that the district court's application of the statute is grounded in the specific factual showing we have described. Nothing in the record mitigates the severity of these facts; if anything, other evidence provides additional support to the finding of unfitness. The district court observed the absence of any remorse by appellant in his statement to the court; the court noted in its amended order that appellant "provided a statement to the Court indicating that he was not an abuser and ... expressed no responsibility or remorse for his actions or their effect on the children."

In sum, respondent has satisfied Minn. Stat. § 260C.301, subd. 1(b)(4), by showing two distinct circumstances: (1) appellant's destruction of the mother-child relationship and the mother's caretaking resources; and (2) appellant's devastation of the father-child relationship by his culpability in murdering the children's mother, resulting in his incarceration for the duration of the children's minority and the loss of their mother's role. The conclusion is

---

2. The statute requires the courts to consider the duration or nature of the "specific conditions relating to the parent and child relationship," but there will rarely be a need to focus on the duration or nature of the particular act of murder. In this case, nothing in the record suggests mitigation of the evident nature of the killing and the sentence.

further supported by the district court's finding that appellant has failed to show remorse for his crime and its impact on his children.

The district court's conclusion and our review address only the meaning of subdivision 1(b)(4); other statutory prerequisites for termination have not been challenged on appeal. And we do not hold that termination of parental rights is the required or preferred option on the showing described, only that these facts meet the statutory definition under subdivision 1(b)(4). Finally, we note that this record shows no extraordinary circumstances that might suggest a different result from that reached by the district court.

■ In *Staat*, the supreme court first expressly addressed a terminated parent's argument that his incarceration alone did not show abandonment of his children. 287 Minn. at 505, 178 N.W.2d at 712–13. The court concluded that the definition of abandonment incorporated an element of intention, which was not shown by "a separation of child and parent due to misfortune and misconduct alone, such as incarceration." *Id.* at 506, 178 N.W.2d at 713. The court noted that incarceration is an impediment to a healthy parent-child relationship, but stated that it does not necessarily make parenting impossible:

> [I]f a parental relationship existed prior to a father's imprisonment and he continued this relationship to the best of his ability during incarceration through letters, cards, and visits where possible, and through inquiry as to his children's welfare, his parental rights would be preserved, both because of his actions and for the benefit of his children.

*Id.* at 507, 178 N.W.2d at 713.

Because Staat did not continue his parental relationship during incarceration, the supreme court affirmed a finding of abandonment and termination of Staat's parental rights. *Id.* at 507, 178 N.W.2d at 714. The court stated that the parent's incarceration was a relevant consideration, along with other factors, "to a finding that the parent has relinquished all parental claims to his child and thereby has abandoned him." *Id.* at 506, 178 N.W.2d at 713. And *Staat* did not involve either a murder of the other parent or incarceration of a duration that lasts throughout the remaining years of the minority of the children. Nor did it involve the lack of remorse present here.

■ Several principles have consistently been drawn from the analysis in *Staat*. First, the statutory definition of the grounds for termination controls, and the parent's incarceration is viewed in light of the statutory language. *See, e.g., In re Welfare of Walker,* 287 N.W.2d 642, 643–44 (Minn.1979) (addressing subdivision 1(b)(2) in light of parent's failure, in and out of prison, "to meet his parental obligations"); *In re Welfare of B.C.,* 356 N.W.2d 328, 332 (Minn.App.1984) (discussing nature and duration of specific conditions that rendered parent palpably unfit, when parent was incarcerated for having murdered another of her children).

■ Second, incarceration is a relevant but not conclusive fact that bears on the application of the statutory grounds at issue. *In re Welfare of Children of R.W.,* 678 N.W.2d 49, 57 (Minn.2004) (affirming termination under subdivision 1(b)(8), inter alia, because efforts made to become a viable parent while in prison would have been insufficient whether he was in prison or not); *Vasquez,* 658 N.W.2d at 253 (holding, under subdivision 1(b)(5), that incarceration was relevant but not dispositive of county's duty to provide reasonable services).

■ Lastly, courts necessarily consider factors related to—but distinct from—the fact of incarceration, including the nature

and consequences of the crime that resulted in incarceration. *In re Welfare of Scott,* 309 Minn. 458, 462, 244 N.W.2d 669, 672 (1976) (stating that murder of other parent, which resulted in incarceration, showed "the volatile nature of [the incarcerated parent's] personality"); *B.C.,* 356 N.W.2d at 331 (Minn.App.1984) (discussing mother incarcerated for murdering one of her children, and her lack of understanding or remorse with respect to the crime).

Based on these considerations, the incarceration rule from *Staat* does not constrain a finding of palpable unfitness under the plain meaning of the statute, given the facts presented here. The termination of appellant's parental rights does not rest solely on the fact that he is in prison but the combination of the facts that he killed the other parent and the term of his sentence.

Because the district court's July order included findings supported by clear and convincing evidence that appellant murdered the children's mother, and that he was to be incarcerated throughout their minority, and because those findings were also included in the district court's September order, the findings are sufficient to establish appellant's palpable unfitness under subdivision 1(b)(4), without the need for any further findings. The district court's conclusion that appellant was palpably unfit is supported by the evidence.

### 2.

Appellant raises four other issues. First, he argues that the district court did not have jurisdiction to amend its July order. Jurisdiction in juvenile court matters is a question of law, reviewed de novo. *In re Welfare of Children of R.A.J.,* 769 N.W.2d 297, 302 (Minn.App.2009). In his posttrial motion, appellant challenged the court's sua sponte order for a new trial.[3] Appellant now argues that the court had no authority to act on the July order because respondent's motion to amend was improper. Appellant did not argue the insufficiency of respondent's motion before the district court, and the issue is waived. *Thiele v. Stich,* 425 N.W.2d 580, 582 (Minn.1988).

Even if we were to address respondent's motion, the record shows that the process was timely and proper. Appellant argues that the motion improperly failed to state the grounds for posttrial relief with particularity, including any evidence, proposed evidence, or proposed findings to support its request. *See Madson v. Minn. Mining & Mfg. Co.,* 612 N.W.2d 168, 172 (Minn. 2000) (requiring party to "stat[e] the grounds for [posttrial] motion with particularity"). If we assume that *Madson* applies to jurisdiction in juvenile matters, it has been satisfied here. The rules permit the district court to amend its findings or its conclusions of law or make new ones, as required. Minn. R. Juv. Prot. 45.06(c), (d). Respondent's motion to amend asked the district court to take either of these actions. It also asserted that the July findings were correct and that the law supported termination of parental rights, or alternatively, that the findings were defective because they were incomplete. In support of the latter argument, respondent plainly described the additional facts that it was asking the court to find and pointed to the evidentiary basis for them in the record. Its motion was proper.

Second, appellant argues that the district court's additional findings about A.I.'s restraining order and his lack of remorse are not supported by the record. But

3. We note that the district court has the authority to order new trials on its own motion in the interests of justice. Minn. R. Juv. P. 45.02 (providing for new trial on court's motion); Minn. R. Juv. P. 45.04(h) (including interests of justice as permissible basis for new trial).

neither finding is statutorily required to establish palpable unfitness. And the findings are not clearly erroneous in any event. The district court did not find that a restraining order had been in place when the murder occurred, but merely quoted, accurately, what the PSI had said about the murder. As relevant to palpable unfitness, the other facts present here are sufficient with or without a restraining order having been in place when it occurred. Regarding appellant's lack of responsibility, his statements at trial could be construed as showing that he did not appreciate the nature of his conduct in murdering the children's mother. *See B.C.*, 356 N.W.2d at 331 (affirming mother's palpable unfitness based in part on her statement that child she had beaten to death was "lucky [because] she doesn't have to grow up in this world"). The district court was present when appellant testified, and we defer to its assessment of his state of mind at the time.

■ Next, appellant argues that respondent did not make sufficient efforts to pursue legal transfer of custody to his sister as an alternative to termination of rights. The permanency statutes direct respondent to conduct a relative search, and require due diligence to notify relatives, consideration of placement without delay, a reasonable and comprehensive search for relatives, and specific content in the notice provided to relatives. *See* Minn. Stat. § 260.012, subd. e(3) (2008); Minn. Stat. § 260C.212, subd. 5 (2008) (establishing requirements cross-referenced in section 260.012).

Transfer of permanent physical and legal custody is not necessarily preferred over termination of rights, and is expressly governed by the children's best interests. Minn.Stat. § 260C.201, subd. 11(c)(2). Furthermore, transfer of legal custody is not an option unless the district court "has reviewed the suitability of the prospective legal and physical custodian." *Id.*, subd. 11(d)(1)(i) (2008). For children under eight years old who have been placed out of the home, a permanency ruling is subject to statutory deadlines. *Id.*, subds. 11a(a), 11a(d)(3) (2008). The record in this case shows that both children were under eight and the permanency deadlines were pressing. Respondent had made contact with C.O. in Nigeria, but had been reasonably delayed by the logistics and international implications of home study in a foreign country. The district court could not approve transfer of custody to C.O. without reviewing the suitability of that option. Because the home study could not be completed before the termination trial, further steps to pursue C.O. as a resource would have delayed a permanency decision. The district court did not abuse its discretion by ruling on the termination petition instead of waiting for further information about C.O.

■ Lastly, appellant alleges that the district court did not act impartially as the fact-finder. He cites statements in the July order in which he suggests the district court "coached" respondent on evidence to provide in an anticipated new trial. It is not improper for the district court to explicate the law by pointing out evidence that could be relevant to a given issue. Furthermore, the district court was not ordering a new trial for respondent only, but to "afford the parties the opportunity to present the full evidentiary record." The district court's decision reflects the fact that a permanent plan for the welfare of the children was not in place, and it reasonably sought to retain jurisdiction over the case to obtain further information, in the children's best interest. This action did not evince bias in favor of respondent.

## DECISION

Although a parent's unavailability due to incarceration alone does not justify termination of parental rights, termination based on palpable unfitness is supported by clear and convincing evidence that the parent has been convicted of murdering the other parent of his children, and that the parent will be incarcerated for the duration of the children's minority. Because those facts have been clearly and convincingly established, the district court did not err in terminating appellant's parental rights.

**Affirmed.**