*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0020**

In the Matter of the Welfare of the Child of: D. S., Parent

**Filed June 6, 2016
Affirmed
Peterson, Judge**

Hennepin County District Court
File No. 27-JV-14-8215

Mary F. Moriarty, Hennepin County Chief Public Defender, Paul J. Maravigli, Assistant Public Defender, Minneapolis, Minnesota (for appellant father D.S.)

Michael O. Freeman, Hennepin County Attorney, Cory A. Carlson, Assistant County Attorney, Minneapolis, Minnesota (for respondent Hennepin County Services and Public Health Department)

Shirley A. Reider, St. Paul, Minnesota (for guardian ad-litem)

Considered and decided by Schellhas, Presiding Judge; Peterson, Judge; and Reyes, Judge.

**U N P U B L I S H E D   O P I N I O N**

**PETERSON**, Judge

Appellant father challenges the termination of his parental rights. Because there is clear and convincing evidence to support the district court's determination that the county's reasonable efforts did not correct the conditions that led to the child's out-of-home placement and that termination is in the child's best interests, we affirm.

# FACTS

D.A.S. was born in 2014, and he has never lived with his parents. D.A.S.'s mother, E.A.N., has a history of chemical abuse and was using drugs while pregnant. The child tested positive for cocaine at birth and has lingering medical conditions from this exposure.[1] Following an expedited permanency petition and hearing four days after his birth, D.A.S. was placed in foster care.

E.A.N. was presumed palpably unfit to parent D.A.S. due to the prior involuntary termination of her parental rights to other children. Following a permanency trial, E.A.N.'s parental rights to D.A.S. were terminated in May 2015.

D.A.S.'s father, appellant D.S., was incarcerated on pending criminal charges when D.A.S. was born. Appellant was furloughed for ten days after the birth and later testified at trial that he visited D.A.S. twice during that period; he also completed genetic testing to determine his parentage to D.A.S., as ordered by the district court.

Appellant's criminal convictions include the following offenses: fifth-degree controlled-substance offense in 2012; second-degree controlled-substance offense (sale) in 2014; and third-degree controlled-substance offense (possession of cocaine) in 2014. For the 2014 convictions, the district court imposed concurrent sentences of 59 months and 45 months. Appellant began serving sentences for the most recent offenses in January 2015,

---

[1] D.A.S. continues to have symptoms that include shaking and inability to sleep at night, and the child has received treatment from a neurologist, a physical therapist, and an occupational therapist. According to the guardian ad litem, D.A.S. needs "constant care" and "constant supervision."

and between that date and November 2015 he was transferred among prisons in St. Cloud, Stillwater, and Moose Lake.

Respondent Hennepin County Human Services and Public Health Department (county) offered appellant a case plan when D.A.S. was placed out of home in December 2014, and began a kinship study. The district court held interim hearings on the case in April, June, and August, 2015. Initially, appellant identified two paternal relatives who could potentially care for D.A.S., and in June, appellant identified Melanie Brookins (a/k/a Melanie Brooks), his fiancé who lives in Michigan, as a possible care provider. Because of permanency considerations for D.A.S., the district court set the matter on for trial when it became aware that appellant's entry date into the Challenge Incarceration Program (CIP) "boot camp" was delayed until September 2015. Completing CIP could have permitted appellant to be released from prison in the spring of 2016 rather than on his projected release date of August 2017.

At the November 9, 2015 permanency trial, the district court received evidence of the county's actions during the first 11 months of D.A.S.'s life, and heard testimony from a social worker, the guardian ad litem, and appellant. Following trial, the district court terminated appellant's parental rights on the statutory grounds of neglecting to comply with the duties of the parent and child relationship, Minn. Stat. § 260C.301, subd. 1(b)(2) (2014); failure of reasonable efforts under the direction of the court to correct the conditions that led to D.A.S.'s out-of-home placement despite the county's reasonable efforts, Minn. Stat. § 260C.301, subd. 1(b)(5) (2014); and D.A.S.'s remaining neglected and in foster

3

care, Minn. Stat. § 260C.301, subd. 1(b)(8) (2014).  Following the denial of his motion for a new trial or amended findings, appellant brought this appeal.

## D E C I S I O N

Whether to terminate a parent's parental rights is discretionary with the district court.  *In re Welfare of Child of R.D.L.*, 853 N.W.2d 127, 136 (Minn. 2014).  Similarly, whether a statutory basis to terminate parental rights exists is committed to the discretion of the district court.  *In re Welfare of J.R.B.*, 805 N.W.2d 895, 900 (Minn. App. 2011), *review denied* (Minn. Jan. 6, 2012).  An appellate court reviews a district court's decision to terminate parental rights to determine whether the district court's findings address the statutory criteria and whether the district court's findings are supported by clear and convincing evidence.  *In re Welfare of Child of T.P.*, 747 N.W.2d 356, 362 (Minn. 2008).  This court "give[s] considerable deference to the district court's decision to terminate parental rights.  But we closely inquire into the sufficiency of the evidence to determine whether it was clear and convincing."  *In re Welfare of Children of S.E.P.*, 744 N.W.2d 381, 385 (Minn. 2008) (citation omitted).  If at least one statutory ground alleged in the petition is supported by clear and convincing evidence and termination of parental rights is in the child's best interests, this court will affirm.  *In re Welfare of Children of R.W.*, 678 N.W.2d 49, 55 (Minn. 2004).

The "evidence must relate to conditions that exist at the time of the termination and it must appear that the conditions giving rise to the termination will continue for a prolonged, indeterminate period."  *In re Welfare of P.R.L.*, 622 N.W.2d 538, 543 (Minn. 2001).  The incarceration of a parent, alone, is an insufficient ground to terminate parental

rights. *In re Child of Simon*, 662 N.W.2d 155, 162 (Minn. App. 2003). But "there is no prohibition against terminating parental rights while the parent is in prison," and the district court can consider the imprisonment "in conjunction with other evidence supporting the petition for termination." *Id.*

***Failure to correct conditions.***

A statutory basis for terminating parental rights can exist if, after the child is placed out of home, "reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the child's placement." Minn. Stat. § 260C.301, subd. 1(b)(5). In determining whether reasonable efforts have been made, the district court must consider "whether services to the child and family were: (1) relevant to the safety and protection of the child; (2) adequate to meet the needs of the child and family; (3) culturally appropriate; (4) available and accessible; (5) consistent and timely; and (6) realistic under the circumstances." Minn. Stat. § 260.012(h) (2014). "Reasonable efforts at rehabilitation are services that go beyond mere matters of form so as to include real, genuine assistance." *In re Welfare of Children of S.W.*, 727 N.W.2d 144, 150 (Minn. App. 2007) (quotation omitted), *review denied* (Minn. Mar. 28, 2007). Appellant argues that the district court erred in finding that the county made reasonable efforts to reunify him with D.A.S. Essentially, appellant appears to argue that the district court terminated his parental rights because of his incarceration without making a real effort to offer him services. He also argues that the district court functionally treated him as if he had abandoned D.A.S. and that this treatment was improper under the law.

5

The district court found that appellant's case plan required that appellant "sign releases of information; establish paternity; obtain safe and suitable housing; engage in parent education; communicate regularly with the [county]; ensure the child's needs were met; maintain contact with the child; and remain law abiding." The district court found that "the services offered [by the county] were realistic under the circumstances, and . . . consider[ed] [appellant's] incarceration." The district court further found:

> [Appellant's] incarceration substantially interfered with his ability to work a case plan to the [c]ourt's satisfaction. Although [appellant] was cooperative, signed releases of information, and to the best of his ability remained in communication with the [county], he was unable to engage in parenting education, obtain safe and suitable housing, or demonstrate that he could care for the day-to-day needs of his child. The [county] did contact the [Minnesota] Department of Corrections to assess what services were available to [appellant] while he remained incarcerated, but discovered that the only parenting education available to him was a group program which he has not yet been able to participate in. Under the circumstances, the [county's] efforts were reasonable and there is nothing more the [county] or the social worker could have done to ensure that [appellant] was able to meet all of the elements of his case plan. [Appellant] remains unavailable to parent and has been unable to correct the conditions that led to [D.A.S.'s] out of home placement.[2]

The main points of the case plan that appellant failed to satisfy were to be available to parent D.A.S., to become educated as a parent, and to assist in ensuring that D.A.S. had proper care and housing while appellant was incarcerated. As noted in the district court's

---

[2] The district court made particularized findings on the reasonableness of the county's efforts under a different statutory basis for termination, but incorporated those findings by reference in reaching its decision to terminate appellant's parental rights under Minn. Stat. § 260C.301, subd. 1(b)(5).

6

findings, appellant met some aspects of his case plan that were directed at complying with his parental duties: he acknowledged his paternity, and he expressed his love for and desire to parent D.A.S. Appellant blames his lack of progress on external factors, but this assertion is not supported by the record or by the district court's findings. Although appellant had to leave the CIP program because of an outstanding warrant for unresolved traffic tickets in Michigan, he testified that he brought the warrant to the attention of the CIP program in October 2015. By that time, he had been incarcerated for nine months. Appellant testified that when the warrant became an impediment, he sought to plead guilty to the Michigan offenses by mail, but the issue was unresolved at the time of the November 2015 trial. Given appellant's uncertain prison release date, the district court did not err in concluding that appellant was unable to parent at the time of the permanency trial and would remain so for the reasonably foreseeable future.

With regard to appellant's obtaining parenting education, the district court made the following findings:

> [Appellant] has not been able to engage in parenting education; although he was on a wait list for group parenting education[,] he was moved to a different institution before he could begin the program. (Testimony of [appellant]). The [county] inquired, but the [Minnesota] Department of Corrections would not permit an outside contractor to provide parenting services. (Testimony of [social worker]). The [county] asked [appellant] to engage in parenting education because he has three other children for whom he is not the primary caregiver, and [appellant] would require additional parenting education to learn to care for [D.A.S.'s] special needs. (Testimony of [social worker]).

The record supports these findings.

The record also supports the district court's determination that appellant was not able to ensure that D.A.S. had proper care while appellant remained incarcerated. At the time of the permanency trial, D.A.S. had resided out of home for nearly a year. D.A.S. had no parent, family member, or other person who could care for him during his father's incarceration. It appears that Brookins--a person whom appellant was dating but who lived in Michigan, was a non-family member, and had never seen D.A.S.--was willing to provide care for D.A.S. But she was first brought to the district court's attention as a potential caretaker in June 2015, and she was not licensed to provide foster care for D.A.S. at the time of the November 2015 permanency trial. The district court concluded that appellant "had options available to him for meeting [D.A.S.'s] needs while he remained incarcerated, but did not put enough effort into any option in order to have the child placed with a relative or his fiancé."

Appellant argues that although the county never sought from the district court a finding of futility of reasonable efforts, the county determined that he was unavailable to parent and did not even attempt to have D.A.S. visit him in prison due to the child's age. But even if it were reasonable to arrange visits in prison, any visits would not have affected appellant's ability to ensure that D.A.S. had proper care while appellant remained incarcerated. Maintaining a relationship with appellant was not an alternative to the care that D.A.S. needed.

Although appellant argues that he "did everything he could do," the record does not show that his progress was sufficient or timely given D.A.S.'s need for permanency. While appellant's incarceration was not a per se reason for terminating his parental rights, his

8

incarceration, considered together with the fact that there was not another relative who could parent D.A.S. during his incarceration, fully supports the district court's findings, and its exercise of its discretion on this record to terminate appellant's parental rights for failing to correct the conditions that led to D.A.S.'s out-of-home placement. *See S.E.P.*, 744 N.W.2d at 386-87 (affirming termination of parental rights for failure to correct conditions when parent failed to provide "adequate safe and stable housing" or "develop necessary parenting skills," even though children were not in out-of-home placement); *cf. In re Welfare of S.Z.*, 547 N.W.2d 886, 894 (Minn. 1996) (noting that for termination based on palpable unfitness to parent, the parent's inability "for the reasonably foreseeable future to meet the ongoing physical, mental, and emotional needs of" the child supported termination).

### D.A.S.'s best interests.

Appellant argues that the district court's best-interests analysis is affected by its erroneous determinations on the reasonable efforts of the county. Because the county's efforts were reasonable and because the district court's best-interests analysis is supported by the evidence in the record and the district court's findings, this argument lacks merit. The district court fully evaluated D.A.S.'s best interests in reaching its decision.

### Other arguments.

Appellant argues that the district court improperly relied on *R.W.*, 678 N.W.2d at 49; *In re the Welfare of the Children of A.I.*, 779 N.W.2d 886 (Minn. App. 2010); and *In re Children of Wildey*, 669 N.W.2d 408 (Minn. App. 2003), *aff'd as modified* (678 N.W. 2d 49 (*R.W.*)). In *A.I.*, this court discussed how a parent's incarceration affected the parent

in "acting in a parental role." 779 N.W.2d at 891-92. There, the father had shot and killed his wife, and this court discussed his incarceration in analyzing whether he was palpably unfit to parent. *Id.* Even in that egregious factual setting, this court stated that "[i]ncarceration alone does not necessarily preclude a person from acting in a parental role," but noted that the fact of incarceration is not "irrelevant" and that it "plainly creates challenges and necessarily decreases an incarcerated person's capacity to provide for day-to-day needs." *Id.* at 892. In citing *A.I.*, the district court in this case was merely drawing upon its broad principles and did not, as appellant asserts, improperly rely on a factually inapposite case to reach an improper conclusion.

Similarly, in *R.W.* and *Wildey*, the underlying facts concerned issues of abandonment and neglect in a scenario that included incarceration of a parent. The supreme court addressed the children-neglected-and-in-foster-care statutory basis for termination in *R.W.* and rejected a formulaic approach to address visitation and child-support issues supporting reasonable-expectations findings for an incarcerated parent, stating that reasonable expectations could "be answered by looking specifically at what actions a parent has taken and the circumstances in which a parent finds himself or herself." 678 N.W.2d at 57. When the same issue was before this court in *Wildey*, this court had labeled the district court's finding of parental desertion "predicated solely on the fact that [the parent was] incarcerated" as "wrong as a matter of law" but was "unpersuaded" by the district court's suggestion in its findings that the parent's intentional commission of crimes could constitute an intentional step toward abandonment of a child. 669 N.W.2d at 414. While some of the district court's findings in this case were similar in tone to those rejected

by this court in *Wildey,* the supreme court's analysis in *R.W.* modified the approach taken by this court in *Wildey*, and this case includes stronger evidence of permanency considerations under the current statute as well as fewer efforts made by the incarcerated parent. Therefore, neither *R.W.* nor *Wildey* dictates the outcome here.

Finally, although the other two statutory grounds for termination find support in the record, we decline to address them individually because only one ground is necessary to support termination. *See R.W.*, 678 N.W.2d at 55.

**Affirmed.**