In the Matter of the WELFARE OF the CHILD OF T.P. and P.P., Parents

In the Matter of the Welfare of the Child of T.P. and D.W., Parents.

No. A07–16.

Supreme Court of Minnesota.

April 17, 2008.

Reid Wheeler Brandborg, Fergus Falls, MN, for appellant.

Kurt Alan Mortenson, Asst. Otter Tail County Atty., Schan E. Sorkness, Helen Ward McPherson, Fergus Falls, for respondent.

## OPINION

ANDERSON, G. BARRY, Justice.

In this appeal, appellant T.P. ("Mother") challenges an order of the Otter Tail County District Court terminating her parental rights under Minn.Stat. § 260C.301, subd. 1(b)(6) (2006), arguing that the district court erred in concluding that there was clear and convincing evidence that the statutory criteria for termination of her parental rights were met. Mother appealed the termination of her parental rights to the court of appeals, which affirmed the district court. We granted review to consider whether the statutory grounds for termination were satisfied, and we affirm the decision of the court of appeals in part, reverse in part, and remand to the district court.

K.L.P., born prematurely on January 23, 2006, is the daughter of Mother and P.P. ("Father").[1] Before being placed in foster care, both K.L.P. and A.R.W., Mother's child from a previous relationship, resided with Mother and Father at the family's home in Fergus Falls. In April 2006, after K.L.P. began attending daycare, Mother noticed several small bruises on K.L.P.'s arms and legs. Mother and Father discussed the bruises, and Father reportedly raised the issue with the daycare facility at a parent conference.

On May 8, 2006, Mother noticed a small red mark on the left side of K.L.P.'s face after Father took K.L.P. into another room to change her diaper. Father told Mother that K.L.P. had kicked herself into the side of the changing table. The head morning teacher at the daycare facility K.L.P. attended also observed on May 8 that K.L.P. had bruises on the left side of her face. Father, who brought K.L.P. to the daycare facility that day, told the teacher that K.L.P. had fallen off a changing table.[2] The teacher documented the

---

1. The district court's decision to terminate the parental rights of Father to K.L.P. is not a part of this appeal.

2. The head morning teacher testified that although K.L.P. "was not rolling over at that time" and did not "scoot around," she could "wiggle her legs a little bit." Mother testified

injuries she observed and Father's explanation of how they occurred.

On the morning of Saturday, June 3, 2006, Father brought K.L.P. to his mother's home. Father's mother, a retired registered nurse, noticed a bruise on the left side of K.L.P.'s face, as well as bruising around the eye and marks on her forehead. Father first told his mother that K.L.P. had fallen off a bed, and when Father's mother questioned how K.L.P. could have been bruised so badly simply by falling on the floor, Father explained that there was a set of keys on the floor with a pair of his pants. Father's mother examined K.L.P.'s injuries and monitored the child's behavior through the morning and into the afternoon. She observed that K.L.P. seemed alert, that she had no blood in the whites of her eyes, and that her eyes "tracked." Father's mother did not report K.L.P.'s injuries to the authorities. Mother was at work when K.L.P. sustained these bruises, but later that day Father explained to Mother that K.L.P. had fallen off the bed.

The bruises on K.L.P.'s face were still visible when Father brought K.L.P. to daycare on Monday, June 5. Father explained to the head morning teacher that K.L.P. had fallen off a bed and hit a dresser, and the teacher documented K.L.P.'s injuries. Theresa Melmer of the Otter Tail County Department of Human Services ("Otter Tail DHS") received a report that K.L.P. had bruises on her face. Melmer, in turn, contacted Detective Carol Schmaltz of the Fergus Falls Police Department. Melmer and Schmaltz met at the daycare facility, where Melmer photographed the bruises on K.L.P.'s face and forehead.

Melmer and Schmaltz met with Mother and Father when the parents came to the daycare facility to pick up K.L.P. Father again explained that K.L.P. had rolled off the bed on the previous Saturday. Melmer and Schmaltz then went to the parents' apartment, where Father demonstrated with a stuffed animal where he had placed K.L.P. on the bed and where he found her on the floor. Melmer testified that the dresser was approximately 17 inches from the bed. Schmaltz told Father that his explanation was not consistent with K.L.P.'s injuries. In the meantime, Melmer arranged for the photographs of K.L.P.'s bruises to be shown to a local pediatrician. Based on those photographs and the explanation offered by Father for K.L.P.'s injuries, the pediatrician recommended that K.L.P. be held for further examination. K.L.P. and A.R.W. were both placed in emergency foster care.

The pediatrician examined K.L.P. on the following day, June 6. He noted three linear bruises on the left side of K.L.P.'s forehead, a more recent bruise under K.L.P.'s left eye, and other bruises on the right side of her forehead and in front of her ears. The pediatrician recommended that X-rays be taken of K.L.P.'s long bones, ribs, and skull. An initial review of K.L.P.'s X-rays showed no fractures, but a second review revealed that K.L.P. had suffered "classic metaphyseal fractures" to her left wrist and right ankle. There were signs of healing in the ankle fracture that usually do not appear until between 4 days and 10 days after the injury, and the absence of such signs of healing near the wrist fracture indicated that it most likely occurred after the ankle fracture.

Otter Tail DHS contacted a medical director of the Red River Children's Advocacy Center who is also a pediatrician to request an evaluation of K.L.P. At the

that on May 8 K.L.P. was "[n]ot rolling over" but "was scooting around on her back."

medical director's recommendation, K.L.P. was admitted to the hospital for further testing. Those tests showed no signs of bruising or bleeding in the brain and indicated that K.L.P. did not have a blood disorder that would have caused the bruises on her face.

Otter Tail DHS filed Child in Need of Protection or Services (CHIPS) petitions for K.L.P. and A.R.W. In July 2006, Otter Tail DHS filed petitions to terminate the parental rights of Mother and Father to K.L.P. and a petition to terminate the parental rights of Mother to A.R.W. The petitions to terminate parental rights alleged that "a child has experienced egregious harm while in the parent(s)' care." The district court subsequently ordered, pursuant to Minn.Stat. § 260.012(a)(1) (2006), that reasonable efforts to prevent placement and for rehabilitation and reunification were not required because the petitions established a prima facie case of egregious harm. The CHIPS petitions and the petitions to terminate parental rights were consolidated for trial.

At trial, the physicians who examined K.L.P.'s injuries testified regarding the likely cause of K.L.P.'s facial bruising and wrist and ankle fractures. The medical director of the Red River Children's Advocacy Center stated that the bruising on K.L.P.'s face was likely not caused by a fall from a bed or by striking a set of keys, which was how Father accounted for the injuries, and explained that the parallel bruising pattern on K.L.P.'s face instead correlated to a handprint or finger markings. The medical director also testified that the fractures suffered by K.L.P. are not typically caused by short falls in children with healthy bones but are "highly specific for nonaccidental trauma." Indeed, the testimony of the medical director, the pediatrician who initially examined K.L.P., and the diagnostic radiologist who noticed the fractures on K.L.P.'s X-rays indicated that these types of fractures are most often caused by shaking, twisting, or bending of the limbs. The medical director clarified, however, that he would not expect Mother to have noticed tenderness around the fractures.

The district court found that each of the physicians provided reliable and credible opinions and conclusions about the nature and likely cause of K.L.P.'s bruising and fractures, and the court adopted their opinions as findings of fact. The court concluded that K.L.P. "experienced egregious harm in her parents' care" and that it was contrary to A.R.W.'s best interests to be in the care of Mother in light of the harm experienced by K.L.P. The court also concluded as follows:

> [Father] admitted to numerous individuals that [K.L.P.] was in his care when the injuries observed on May 8, 2006, and on June 5, 2006, occurred. Additionally, [Mother] acknowledged that she and [Father] were [A.R.W.'s and K.L.P.'s] primary caretakers before the children were removed from the home. As such, the Court finds clear and convincing evidence to believe that the injuries to [K.L.P.'s] head occurred on June 3, 2006, and at a time when she was in the direct physical care of [Father]. Moreover, the Court finds clear and convincing evidence to believe that [K.L.P.'s] fractures occurred at a time when she was in the care of [Father and Mother] either jointly or individually. The egregious harm [K.L.P.] suffered does not have to have been sustained at [Mother's] hand, but merely while [K.L.P.] was in her care and custody.

Concluding that it was in the best interests of the children, the court ordered the termination of Mother's parental rights to K.L.P. and A.R.W. and the termination of Father's parental rights to K.L.P.

Mother appealed, arguing that there was no clear and convincing evidence that the children suffered egregious harm while in her care, that the termination of her parental rights was not in the best interests of the children, and that she was denied effective assistance of counsel. In an unpublished opinion, the court of appeals held that the district court "did not clearly err in finding that clear and convincing evidence exists to show that K.L.P. suffered egregious harm while in [Mother's] care." *In re Welfare of Child of T.P. & P.P.*, No. A07–16, 2007 WL 2178052, at *5 (Minn.App. July 31, 2007). The court of appeals rejected Mother's argument "that there was insufficient evidence that she 'knew or should have known that abuse was taking place'" because the explanation for K.L.P.'s injuries offered by Father was inconsistent with K.L.P.'s mobility. *Id.* at *3–4. The court of appeals also determined that the record supported the finding that K.L.P. experienced egregious harm in Mother's care because (1) Mother and Father were the primary caretakers of K.L.P., (2) Father provided explanations for K.L.P.'s injuries that were inconsistent with K.L.P.'s physical abilities, and (3) Mother must have noticed the bruising because it was noticed by daycare providers. *Id.* at *4. Finally, the court of appeals held that the record supported the finding that termination of Mother's parental rights was in the best interests of the children. *Id.* at *6. We granted review on the issue of whether the requirements of Minn.Stat. § 260C.301, subd. 1(b)(6), were satisfied in this case.

## I.

■ Minnesota Statutes § 260C.301, subd. 1 (2006), sets forth the statutory grounds for the termination of parental rights. The district court terminated Mother's parental rights pursuant to Minn. Stat. § 260C.301, subd. 1(b)(6) ("the egregious harm provision"), under which a court may terminate the rights of a parent to a child if it finds the following:

> that a child has experienced egregious harm in the parent's care which is of a nature, duration, or chronicity that indicates a lack of regard for the child's well-being, such that a reasonable person would believe it contrary to the best interest of the child or of any child to be in the parent's care.

"Egregious harm" is defined as "the infliction of bodily harm to a child or neglect of a child which demonstrates a grossly inadequate ability to provide minimally adequate parental care." Minn.Stat. § 260C.007, subd. 14 (2006). The definition also includes a non-exclusive list of specific conduct towards a child that constitutes egregious harm. *Id.* That K.L.P. suffered egregious harm is not disputed here.

■ The principal question presented in this appeal is the meaning of the phrase "in the parent's care" found in the egregious harm provision, a phrase that is undefined in the child protection statutes. Statutory interpretation is a question of law that we review de novo. *In re Welfare of J.M.*, 574 N.W.2d 717, 721 (Minn.1998).

■ The undefined and unexplained phrase "in the parent's care" has a range of possible meanings. At one extreme, it could be interpreted strictly to require that the injury to the child occur in the physical presence of, if not at the hands of, the parent. Alternatively, the phrase "in the parent's care" could be a reference simply to legal or physical custody of a child.[3] When a statute is open to more

---

**3.** "Care" is defined as "[w]atchful oversight" or "charge or supervision," as in *"left the child in the care of a neighbor." The American Heritage Dictionary of the English Lan-*

than one interpretation, we "adopt the most logical and practical definition" after determining the probable intent of the legislature. *Nelson's Office Supply Stores, Inc. v. Comm'r of Revenue,* 508 N.W.2d 776, 778 (Minn.1993). But we also "read and construe a statute as a whole," and we "'interpret each section in light of the surrounding sections to avoid conflicting interpretations.'" *Martin ex rel. Hoff v. City of Rochester,* 642 N.W.2d 1, 12 (Minn. 2002) (quoting *Am. Family Ins. Group v. Schroedl,* 616 N.W.2d 273, 277 (Minn. 2000)); *see also Wong v. Am. Family Mut. Ins. Co.,* 576 N.W.2d 742, 745 (Minn.1998) ("We have stated that the 'meaning of doubtful words in a legislative act may be determined by reference to their association with other associated words and phrases.'" (quoting *State v. Suess,* 236 Minn. 174, 182, 52 N.W.2d 409, 415 (1952))). Therefore, we turn first to other provisions of section 260C.301 for guidance.

Section 260C.301 uses the term "care" in several other provisions providing grounds for termination. For example, subdivision 1(b)(2) permits termination of the rights of a parent who has failed "to provid[e] the child with necessary food, clothing, shelter, education, and other *care* and control necessary for the child's physical, mental, or emotional health and development." Minn.Stat. § 260C.301, subd. 1(b)(2) (emphasis added). Similarly, subdivision 1(b)(4) permits termination of the rights of a parent deemed "palpably unfit" to be a party to the parent-child relationship because the parent is unable "to *care* appropriately for the ongoing physical, mental, or emotional needs of the child." *Id.,* subd. 1(b)(4) (emphasis added). Though none of these provisions exactly repeats

the phrase "in the parent's care" from the egregious harm provision, these provisions indicate a legislative intent that the use of the term "care" is properly understood in the broader sense of the parent and child relationship, including providing for the well-being of a child in ways that do not require a parent to be physically present with the child.

■ Thus, we agree with the court of appeals that "in the parent's care" should not be limited to the physical presence of a parent at the time egregious harm occurs. *See In re Welfare of Child of T.P. & P.P.,* 2007 WL 2178052, at *3–5. But for purposes of this opinion, it is not necessary for us to determine whether, at the other extreme, "in the parent's care" requires nothing more than legal or physical custody. Here, K.L.P.'s fractures and facial bruising occurred at a time when Mother's relationship with Father was intact, K.L.P. resided with both parents, and Mother acknowledged that she and Father were the primary caretakers for K.L.P. We further conclude that, under these circumstances, the record supports the district court's finding that Mother's relationship with K.L.P. satisfied the requirement of the egregious harm provision that a child has experienced egregious harm while "in the parent's care," and we affirm the court of appeals on this point as well.

II.

■ Termination of parental rights under the egregious harm provision requires more than a child experiencing egregious harm "in the parent's care." Minn.Stat. § 260C.301, subd. 1(b)(6). It also requires a finding that the egregious harm "is of a nature, duration, or chronicity that indicates a lack of regard for the child's well-

*guage* 281 (4th ed.2000). This common understanding of the word "care" also does

little to clarify the specific issue before us.

being, such that a reasonable person would believe it contrary to the best interest of the child or of any child to be in the parent's care." *Id.* We now address Mother's argument that, under the egregious harm provision, the rights of a parent who has not inflicted egregious harm may not be terminated unless that parent either knew or should have known that egregious harm occurred.

Where a parent has not personally inflicted egregious harm on the child, it is difficult to conceive how the "nature, duration, or chronicity" of that harm could indicate that parent's lack of regard for the well-being of the child unless that parent were somehow aware of the harm and its cause. Stated differently, the mere fact that a child experienced egregious harm does not indicate a lack of regard for the well-being of the child on the part of a parent who did not personally inflict the egregious harm, did not actually know about the harm, and could not have been expected to know about the harm. Interpreting the egregious harm provision to permit termination where a parent did not know and could not have been expected to know that a child experienced egregious harm would contradict the statutory requirement that the "nature, duration, or chronicity [of the egregious harm] indicates a lack of regard for the child's well-being." Minn.Stat. § 260C.301, subd. 1(b)(6). The language of the egregious harm provision, taken as a whole, does not support termination of parental rights where a parent neither knew nor should

have known that a child experienced egregious harm.

Therefore, we hold that to terminate the rights of a parent who has not personally inflicted egregious harm on a child, a court must find that the parent either knew or should have known that the child had experienced egregious harm.[4] As with findings addressing other statutory criteria in termination cases, the court must find that the non-perpetrating parent knew or should have known that egregious harm occurred by clear and convincing evidence. *See* Minn.Stat. § 260C.163, subd. 1(a) (2006) ("To be proved at trial, allegations of a petition alleging a child to be in need of protection or services must be proved by clear and convincing evidence."); *In re Children of T.A.A.*, 702 N.W.2d 703, 708 (Minn.2005) ("In reviewing a decision to terminate parental rights, the appellate court determines whether there is clear and convincing evidence to support at least one statutory ground for termination * * *.").

The district court made several findings and conclusions related to Mother's lack of regard for K.L.P.'s well-being as a result of the nature, duration, or chronicity of the egregious harm K.L.P. experienced. The court of appeals rejected Mother's argument that the evidence against her was not clear and convincing as to her culpability, relying on the district court's finding that the harm to K.L.P. occurred while K.L.P. was in the parents' care "either jointly or individually." *In re Welfare of Child of T.P. & P.P.*, 2007 WL 2178052, at *4. But

---

4. It is appropriate to clarify here that, where a parent who has not inflicted egregious harm but who either knew or should have known that a child experienced egregious harm, the "nature, duration, or chronicity" of the egregious harm may not necessarily "indicate[ ] a lack of regard [by that parent] for the child's well-being." Minn.Stat. § 260C.301, subd. 1(b)(6). That such a parent either knew or

should have known that a child experienced egregious harm is necessary, but not sufficient, to satisfy that statutory requirement. Other factors will be relevant to whether that requirement is met in a given case. Because it is unnecessary to our decision in this case, however, we express no opinion on this matter here.

none of the district court's findings or conclusions specifically addresses the "knew or should have known" standard we announce here. As a result, we are unable to determine from the record whether Mother knew or should have known that K.L.P. experienced egregious harm. Therefore, we reverse the decision of the court of appeals affirming the termination of Mother's parental rights and remand to the district court to address whether there is clear and convincing evidence that Mother knew or should have known that the bruising and the fractures K.L.P. sustained occurred as a result of some conduct satisfying the "egregious harm" definition.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

DIETZEN, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.