*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0319**

In the Matter of the Welfare of the Child of:
K. M. A. and M. R. H., Parents

**Filed August 18, 2014
Affirmed
Peterson, Judge**

Steele County District Court
File No. 74-JV-13-2063

Benjamin Michael Cass, Smith Tollefson & Rahrick, Owatonna, Minnesota (for appellant mother)

Erin Elisabeth Lindhart Felten, Patton Hoversten & Berg PA, Owatonna, Minnesota (for respondent father)

Daniel McIntosh, Steele County Attorney, James Scott Cole, Assistant County Attorney, Owatonna, Minnesota (for respondent Steele County)

Roxanne Kotek, Faribault, Minnesota (guardian ad litem)

　　　　Considered and decided by Peterson, Presiding Judge; Reilly, Judge; and Reyes, Judge.

**U N P U B L I S H E D   O P I N I O N**

**PETERSON**, Judge

　　　　Appellant-mother challenges the termination of her parental rights, arguing that the record does not support the district court's determinations that (1) mother is, and will remain for the foreseeable future, a palpably unfit parent; (2) termination of mother's

parental rights is in the child's best interests; and (3) transferring permanent custody to the maternal grandparents is not in the child's best interests. We affirm.

## FACTS

*Background*

Appellant-mother K.M.A. challenges the termination of her parental rights to daughter K.H., born January 13, 2007. K.H. was the subject of a previous child-in-need-of-protection-or-services (CHIPS) petition between 2009 and 2011 due to a lack of supervision and mother's mental-health and chemical-dependency problems. For six months during 2010, mother was civilly committed as mentally ill and chemically dependent. During most of the time the CHIPS case was open, K.H. was placed with her maternal grandparents under a delegation of parental authority executed by mother. The CHIPS petition was dismissed on the understanding that mother would continue to work with respondent Steele County Human Services (SCHS) on a voluntary basis, but mother did not do so.

On November 1, 2012, SCHS received a child-protection report after a law-enforcement officer went to the grandparents' home to question mother about $1,000 in coins that grandfather had reported missing. The officer reported that mother's pupils were dilated and she appeared to be "very high." The officer described mother's room as filthy and covered with clothes, old food, and garbage. Because K.H. was not staying in that room, the officer did not remove her from the home.

On November 13, 2012, SCHS received a report that K.H. had missed seven full days of school without excuse between September 20 and November 13.

On November 16, 2012, mother brought K.H. to K.H.'s paternal grandmother's house in Austin, Minnesota, for a family get together. Mother was supposed to pick up K.H. the next day but did not do so. During the next several days, paternal grandmother unsuccessfully tried to reach mother by telephone. Paternal grandmother contacted Mower County Human Services, which referred her to SCHS. Paternal grandmother learned that maternal grandfather was critically ill and left voice mails for mother saying that she was willing to have K.H. stay with her but needed authorization to enroll K.H. in school in Austin.

Janel Pitzen, a child-protection specialist for SCHS, talked to mother by telephone on November 20, 2012, and went to meet with her in Austin the next day. Mother reported that she had been kicked out of her parents' house and wanted to look into housing options before having K.H. enrolled in school. Pitzen instructed mother to call within five days with a decision about where K.H. would stay and attend school. Mother did not contact Pitzen until November 30 when she left a voice mail asking Pitzen to call the next morning. Pitzen telephoned mother in the morning but was unable to reach her.

Also on November 30, SCHS filed a CHIPS petition regarding K.H. Mother's location was unknown to SCHS. An admit/deny hearing was held on December 12, and the district court ordered K.H. placed in foster care with her paternal grandmother. Mother did not appear at the hearing but was in the hallway outside the hearing room afterwards, and Pitzen talked with her.

A meeting to develop an out-of-home-placement plan (OHPP) was scheduled for January 10, 2013, at paternal grandmother's home. Mother did not attend the meeting.

The purpose of the meeting was to create a reunification plan, and Mary Lange, a child-protection specialist for SCHS, had discussed the importance of the meeting with mother. SCHS developed a plan and attempted to provide services to mother, but mother failed to return telephone calls, missed visits with K.H., and did not attend meetings.

In April 2013, paternal grandmother requested that K.H. be removed from her care due to problems communicating and coordinating with mother and maternal grandparents. Placing K.H. with maternal grandparents was not an option because they did not have a foster-care license and they failed to comply with supervision requirements during a visit on the weekend of April 20. K.H. was placed in nonrelative foster care. A second OHPP was developed in May 2013, and on May 13, 2013, the district court ordered SCHS to file a termination petition. A petition to terminate parental rights was filed on June 11, 2013. The matter was set for trial on August 26, 2013, and continued until September 4, 2013.

In September 2013, the parties entered into a stipulation, under which SCHS agreed to withdraw the termination petition and continue the CHIPS proceeding, and mother agreed to comply with case-plan requirements, including obtaining chemical-dependency treatment. Mother failed to comply with the stipulation, and, on October 22, 2013, SCHS filed another petition to terminate parental rights.

Mother has a history of being in abusive relationships. During a February 2013 parenting evaluation, mother stated that K.H.'s father was "very physically abusive to her." Mother also said that she had heard that after father was released from jail in December 2012, he was not "doing very well with sobriety." In December 2013, mother

4

was involved in an abusive relationship with a man who provided her with prescription drugs.

At trial, mother admitted that her current housing was unsuitable for K.H.

Mother failed to comply with the case-plan requirement that mother have supervised visits with K.H. for at least one hour at least three times every week.

*Chemical dependency*

Mother admitted that in December 2012 and January 2013, she used prescription drugs that had not been prescribed for her. When Lange talked with mother on December 12, 2012, mother's pupils were dilated, and "[h]er conversation was a little confusing." Lange believed that mother was under the influence of a controlled substance and requested that mother submit to a urine analysis, but mother did not do so. Mother submitted to a drug screening on December 21, 2012, and tested positive for an amphetamine.

Barbara Carlson, a licensed drug-and-alcohol counselor (LDAC), testified that during an evaluation on January 31, 2013, mother's pupils were dilated and she seemed "very, very distracted." Carlson recommended:

> Until such time as [mother] would attend treatment, establish a reasonable period of sobriety outside of a treatment program, and complete other recommendations set forth by the Court or a case plan, it does not appear it would be in the best interests of [K.H.] to have her returned to her mother's care. In addition, any visitation should be supervised, for it is felt that the risk of [mother] being under the influence of mood altering chemicals while she would have [K.H.] in her care is too great.

5

Paternal grandmother testified that in the afternoon on February 17, 2013, mother and father came to her house to visit K.H. and both appeared to be under the influence.

Jaclyn Schlichter, a mental-health practitioner with Fernbrook Family Center, testified that on October 29 or 30, 2013, mother arrived one hour late for a family therapy session with K.H. Mother appeared tired and lethargic and provided little input at the session. While interacting with K.H. during the session, mother fell asleep. Schlichter testified that mother "would wake up and would mumble some things and then go back to sleep." LDAC John Wittkopp testified that drowsiness and disorientation are consistent with the use of benzodiazepines.

Mother submitted to a drug screening on November 14, 2013, and tested positive for "amphetamine and methamphetamine." LDAC James Krulish testified that on December 2, 2013, mother stated that she was using Klonopin, which is a benzodiazepine, and was being provided the drug by a person with whom she was in a relationship. The previous month, mother had told Krulish that she had been prescribed Klonopin, which concerned Krulish due to mother's history of benzodiazepine abuse.

On December 21, 2012, and January 28, 2013, the district court ordered mother to complete a chemical-dependency evaluation. On February 14, 2013, the district court ordered mother to immediately complete a chemical-dependency evaluation and allowed her one week to arrange for treatment with providers of her choice.

After failing to show up for eight scheduled evaluations, mother completed a chemical-dependency evaluation with LDAC Wittkopp on April 29, 2013. One of

Wittkopp's recommendations was that mother undergo outpatient relapse treatment. Mother did not attend orientation at the treatment center until July 2013.

In August 2013, LDAC Angela Bance informed mother that she would be terminated from the treatment program due to poor attendance unless she contacted the treatment facility within five days and reengaged in treatment. For the next four months, mother attended treatment sporadically. A December 2, 2013, report states:

> At this point in time [mother] is in a significantly poor place with her sobriety and needs to address this at a much more intensive level. It is informed that she needs to be reassessed and reevaluated for her chemical dependency issues and a different treatment modality may be entertained. . . . Prognosis is poor.

On December 19, 2013, Krulish informed mother that her insurance had lapsed and that she would be discharged from treatment if she did not arrange for payment. Krulish explained that mother could obtain public funding to continue treatment by completing another rule-25 chemical-dependency evaluation. Mother did not do so, and she was discharged unsuccessfully from treatment on December 27, 2013.

*Mental-health therapy*

On April 22, 2013, mother underwent an assessment at Fernbrook Family Center that produced the following diagnoses: Axis I—major depressive disorder, single episode – moderate, generalized anxiety disorder; Axis II—rule out - borderline personality disorder. Hannah Driver of Fernbrook repeatedly tried contacting mother to discuss a treatment plan and schedule therapy sessions but was unsuccessful. From July through November 2013, mother canceled numerous therapy sessions, and Driver reported no

7

progress due to difficulties in scheduling appointments with mother and mother failing to follow through on them.

Rachel Whisney was assigned to provide adult rehabilitative mental-health services to mother. Goals included improving coping skills, developing consistency in attending and following through on appointments, and improving interpersonal skills. From June until about the middle of August 2013, mother made it to about 70% of her appointments and was making progress toward her goals. After August, mother's attendance became sporadic, and she made no further progress.

*Termination order*

The district court terminated mother's parental rights based on several statutory grounds, including that mother is, and will remain for the reasonably foreseeable future, palpably unfit to be a party to the parent-and-child relationship. The court determined that termination is in K.H.'s best interests and declined to transfer custody to maternal grandparents.

## D E C I S I O N

An appellate court reviews a decision to terminate parental rights to determine whether the district court's findings address the statutory criteria and whether the district court's findings are supported by clear and convincing evidence. *In re Welfare of Child of T.P.,* 747 N.W.2d 356, 362 (Minn. 2008). In doing so, "[w]e give considerable deference to the district court's decision to terminate parental rights. But we closely inquire into the sufficiency of the evidence to determine whether it was clear and convincing." *In re Welfare of Children of S.E.P.,* 744 N.W.2d 381, 385 (Minn. 2008)

8

(citation omitted). "[W]e review the [district court's] determination of whether a particular statutory basis for involuntarily terminating parental rights is present for an abuse of discretion." *In re Welfare of Children of J.R.B.,* 805 N.W.2d 895, 901 (Minn. App. 2011), *review denied* (Minn. Jan. 6, 2012). If at least one statutory ground alleged in the petition is supported by clear and convincing evidence and termination of parental rights is in the child's best interests, we will affirm. *In re Welfare of Children of R.W.,* 678 N.W.2d 49, 55 (Minn. 2004). The county bears the burden of proving a ground for termination. *In re Welfare of M.H.,* 595 N.W.2d 223, 227 (Minn. App. 1999).

## I.

The district court may terminate parental rights if the parent

> is palpably unfit to be a party to the parent and child relationship because of a consistent pattern of specific conduct before the child or of specific conditions directly relating to the parent and child relationship either of which are determined by the court to be of a duration or nature that renders the parent unable, for the reasonably foreseeable future, to care appropriately for the ongoing physical, mental, or emotional needs of the child.

Minn. Stat. § 260C.301, subd. 1(b)(4) (2012).

Mother argues that the evidence does not show that she "suffers a specific condition that renders [her] unable to parent for the reasonably foreseeable future." But the district court found that the conditions that make mother palpably unfit

> most significantly include [mother's] untreated chemical dependency, despite the availability of appropriate treatment, [mother's] failure to follow the recommendations of the parenting evaluation, [mother's] failure to attend or follow the OHPP case plans, and failure to abide by the terms of the Stipulation she entered into in September of 2013. The

9

> services recommended by [SCHS] in each of these instances were intended to provide [mother] with a minimal level of stability to work toward reunification with her daughter. These same services have been offered and reiterated at several intervals since November of 2012, but [mother] has consistently refused to accept the benefits of these services.

Mother argues that she made progress in mental-health therapy despite sporadic attendance. But Driver testified that mother made no progress, and Whisney testified that she made no progress after August 2013.

Mother also argues that she made progress in chemical-dependency treatment and that she was discharged because her insurance coverage terminated. But mother could have continued treatment by undergoing a second rule-25 assessment, which would have enabled her to obtain public funding, and the record contains evidence that mother did not make progress in treatment. Four witnesses testified about incidents between December 2012 and October 2013 when mother appeared to be under the influence of a controlled substance, mother tested positive for "amphetamine and methamphetamine" in November 2013, and she admitted using a benzodiazepine without a prescription in December 2013. Also, a December 2, 2013, report stated that mother's chemical-dependency prognosis was poor.

Mother has a history of providing inadequate supervision for K.H., including mother's extended absences without explanation and her failure to ensure that K.H. attended school. Mother failed to comply with OHPP requirements for family therapy and visitation with K.H. SCHS provided mother referrals to employment and housing services, but, at the time of trial, mother remained unemployed and did not have suitable

10

housing for K.H. About one month before trial, mother told Krulish that she was involved in an abusive relationship with a man who provided her with prescription drugs.

Mother argues that she had unapproved visits with K.H. between December 2012 and April 2013, that K.H. benefited from those visits, and K.H.'s placement in nonrelative foster care resulted in a significant reduction in visitation. SCHS had legitimate reasons for placing K.H. in nonrelative foster care instead of with maternal grandparents; K.H. was subjected to educational neglect and conflict between mother and maternal grandparents when residing with maternal grandparents, and maternal grandparents were unwilling or unable to consistently meet K.H.'s needs. SCHS also had legitimate reasons for requiring supervised visitation, and it was mother's responsibility to comply with OHPP requirements.

Clear-and-convincing evidence supports the district court's detailed findings addressing the events leading up to and following the CHIPS petition, mother's failure to comply with OHPP requirements, and her lack of progress in mental-health and chemical-dependency treatment. Based on those findings, the district court did not abuse its discretion in determining that mother is, and will remain for the reasonably foreseeable future, palpably unfit to be a party to the parent-and-child relationship. Because a single statutory basis is sufficient to support a termination, we do not address the other statutory grounds determined by the district court.

11

## II.

In every termination proceeding, "the best interests of the child must be the paramount consideration." Minn. Stat. § 260C.301, subd. 7 (2012). Even if a statutory ground for termination exists, the district court must still find that termination of parental rights is in the child's best interests. *In re Children of T.A.A.,* 702 N.W.2d 703, 708 (Minn. 2005). In considering the child's best interests, the district court must balance the preservation of the parent-child relationship against any competing interests of the child. *In re Welfare of M.G.,* 407 N.W.2d 118, 121 (Minn. App. 1987). "Competing interests include such things as a stable environment, health considerations and the child's preferences." *In re Welfare of R.T.B.,* 492 N.W.2d 1, 4 (Minn. App. 1992). "Where the interests of parent and child conflict, the interests of the child are paramount." Minn. Stat. § 260C.301, subd. 7. "We review a district court's ultimate determination that termination is in a child's best interest for an abuse of discretion." *J.R.B.,* 805 N.W.2d at 905.

The district court found:

> 195. The evidence demonstrates that [mother] has not provided nor will likely provide a stable and safe home for [K.H.], free of illegal chemical use and domestic violence.

> 196. The evidence demonstrates that [mother] has not been nor will likely be a stable, predictable, or responsible parent to [K.H.]. [Mother] has a history of coming and going from [K.H.'s] life, whether physically or emotionally due to chemical use, mental illness, and unfortunate choices regarding relationships. As [paternal grandmother] testified and [the guardian ad litem (GAL)] agreed, [mother] has treated [K.H.] as if she were a toy on a shelf; an object that is given attention sporadically, but is otherwise left to collect

12

dust. [Mother] has had ample opportunities to avoid foster care placement and, once she did not do so, to work toward reunification with [K.H.]. [Mother] has not done so.

197. [Mother] has not completed the recommendations of the parenting evaluation, her chemical dependency treatment, the OHPP's, or the Stipulation she entered into in September 2013. All of these efforts were designed to aid her in being able to safely and consistently assume the care of her child.

198. [Mother's] parenting evaluation stated: "Until such time as [mother] would attend treatment, establish a reasonable period of sobriety outside of a treatment program and complete other recommendations set forth by the Court or a case plan, it does not appear that it would be in the best interests of [K.H.] to have her returned to mother's care. In addition, any visitation should be supervised, for it is felt that the risk of [mother] being under the influence of mood altering chemicals while she would have [K.H.] in her care is too great."

199. [Mother] does not share a bond with [K.H.] such that [mother] is willing to put [K.H.'s] current and future needs first and foremost.

The court acknowledged that K.H. and mother love each other but found that termination is in K.H.'s best interests because mother had not addressed her substance-abuse problem and for the reasonably foreseeable future did not have the ability to consistently be a caring, loving, and protective parent. The court also found that K.H. needs the stability, care, and love that an adoptive family could provide her.

Clear-and-convincing evidence supports the district court's findings on K.H.'s best interests, and the district court did not abuse its discretion in determining that termination is in K.H.'s best interests.

When considering a transfer of legal custody as a permanency option, the district court must determine the suitability of the prospective legal and physical custodian. *In re Welfare of Children of K.S.F.*, 823 N.W.2d 656, 668-69 (Minn. App. 2012).

Maternal grandparents did not submit to a home study or parenting evaluations to assess their current suitability as permanent custodians. The district court made findings on the environment in which mother was raised and found that that environment weighed against finding maternal grandparents as suitable permanent custodians of K.H. The district court also made findings on mother's testimony about maternal grandmother's excessive medication use, K.H. being the subject of two child-protection intake reports in November 2012 when residing with maternal grandparents, and maternal grandmother's admission that she had primary responsibility for getting K.H. to school during the 2012-2013 school year when mother was unexpectedly absent from home.

Mother argues that the findings on the unsuitability of maternal grandparents' home are contrary to K.H.'s placement with them during the first CHIPS proceeding from 2009 until 2011. But the issue is whether the evidence in the record supports the district court's findings, not why SCHS allowed the placement during the previous CHIPS proceeding.

Mother argues that SCHS's argument against placement with maternal grandparents is mainly based on speculation that mother will reside with maternal grandparents. The district court found:

203. [Maternal grandparents] were unwilling to exclude [mother] from their home in order to progress with the foster care application in mid-2013. [They] testified during the trial that they were currently willing to "choose" [K.H.] over [mother], but qualified this choice by stating they would not want their daughter to be homeless.

204. If custody of [K.H.] was transferred to [maternal grandparents], it is likely that [mother] would continue to either reside intermittently with [maternal grandparents] in the future or at minimum would continue to communicate and engage in conflict with [maternal grandparents].

The district court's consideration of conduct that occurred about six months before trial does not make the finding speculative, particularly in light of the fact that mother did not have suitable housing at the time of trial.

The district court did not err in declining to transfer custody to maternal grandparents.

**Affirmed.**