*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0940**

In the Matter of the Welfare of the Child of:
C. A. P., Parent

**Filed November 9, 2015
Affirmed
Chutich, Judge**

Hennepin County District Court
File No. 27-JV-14-7814

Mary F. Moriarty, Hennepin County Public Defender, Paul J. Maravigli, Assistant Public Defender, Minneapolis, Minnesota (for appellant mother)

Colin T. Nelson, Assistant Public Defender, Minneapolis, Minnesota (for appellant father)

Michael O. Freeman, Hennepin County Attorney, Michelle Hatcher, Assistant County Attorney, Minneapolis, Minnesota (for respondent Hennepin County Human Services)

Thomas J. Nolan, Jr., Nolan Law Offices, Minneapolis, Minnesota (for guardian ad litem)

Considered and decided by Ross, Presiding Judge; Chutich, Judge; and Hooten, Judge.

**U N P U B L I S H E D   O P I N I O N**

**CHUTICH**, Judge

Appellant mother, C.A.P., challenges the district court's termination of her parental rights to her child, A.D.H. She contends that the district court erred by determining that the child suffered egregious harm and that termination of her parental

rights is in the child's best interests. Because the district court properly addressed the statutory criteria for termination, and clear and convincing evidence supports its findings, we affirm.

**FACTS**

Appellant mother, C.A.P., and father, R.D.H., are the parents of A.D.H., born December 29, 2011. They were also the parents of K.R.H., who died December 9, 2014, after the father repeatedly punched him in the chest when the child was almost two years old.

As early as January 2012, R.D.H. reportedly assaulted C.A.P. in A.D.H.'s presence in their shared home. The state did not prosecute R.D.H. because C.A.P. told police that she did not wish to press charges. In April 2012, police again responded to reports that R.D.H. assaulted C.A.P. in the presence of A.D.H.

Hennepin County Child Protection Services first became involved with the parents in May 2012, when the county learned that R.D.H. hit C.A.P. and four-month-old A.D.H. in the mouth and forcefully grabbed A.D.H. by the arm. The county placed A.D.H. on a 72-hour police health-and-welfare hold but released the child to C.A.P.'s care after she reported that she ended her relationship with R.D.H.

Less than a month later, C.A.P. reported to the county that she and the child had moved to Illinois and were again living with R.D.H. The county made a finding of maltreatment against C.A.P. for failure to protect A.D.H. from abuse and harm and a finding of maltreatment against R.D.H. for neglect and physical abuse. The county closed the case, however, because the family had left the state.

C.A.P. gave birth to K.R.H. on January 1, 2013. By April 2013, R.D.H. and C.A.P. had relocated to Kalamazoo, Michigan, with both children. On April 30, 2013, before K.R.H. had turned four months old, R.D.H. reportedly hit him across the face with an open hand, causing bruises and bursting a blood vessel in the infant's right eye. C.A.P. intervened, but R.D.H. responded by choking her. C.A.P.'s mother alerted Kalamazoo police and they arrested R.D.H.

When K.R.H. was taken to the hospital following the abuse, doctors determined that he had suffered hemorrhaging in his eye and bruises to his buttocks, abdomen, and face, and that his injuries were consistent with physical abuse. Doctors also examined A.D.H. and reported that he appeared extremely thin for his age. They noted that his weight was in the fifth percentile for his age-group. Michigan Children's Protective Services filed a petition requesting removal of the children, but C.A.P. returned to Minnesota with them before the petition hearing.

Michigan Children's Protective Services alerted Hennepin County to the case, and the county again opened an investigation of both parents. The county learned that Michigan prosecutors dismissed the case against R.D.H. for lack of a witness. Following his release from jail, R.D.H. returned to live with C.A.P. and the children in Minneapolis. On June 27, 2013, the county filed an emergency petition, alleging that A.D.H. and K.R.H. were in need of protection or services based on K.R.H.'s April 2013 injuries. On July 23, 2013, C.A.P. obtained an order for protection for herself and on behalf of both children.

The district court adjudicated A.D.H. and K.R.H. to be in need of protection or services and transferred their legal custody to the Hennepin County Human Services and Public Health Department ("the department"). To achieve reunification with the children, the district court ordered R.D.H. and C.A.P. to complete case plans. C.A.P.'s case plan included the following conditions: (1) participate in domestic violence programming and follow all recommendations; (2) abstain from the possession, use or sale of illegal drugs; (3) complete a psychological evaluation and follow all recommendations; (4) complete a parenting assessment and follow all recommendations; (5) maintain and cooperate with the order for protection against R.D.H.; (6) maintain safe and suitable housing, free of any domestic or physical violence; and (7) cooperate with the child protection social worker.

On October 11, 2013, Minneapolis police found C.A.P. in a car with R.D.H., in violation of the order for protection. Hennepin County Child Protection Services did not learn of the violation until its investigation into the death of K.R.H.

In the meantime, service providers reported that C.A.P. fully complied with her case plan. The district court ordered that the children be permanently reunified with her in March 2014. R.D.H. completed little to none of his case plan and was excluded from the district court's reunification order. Unknown to the county, C.A.P. attempted unsuccessfully to have the order for protection against R.D.H. dismissed in November 2014.

The county intervened again on December 12, 2014, after K.R.H. died from a beating by R.D.H. C.A.P. told police that on the night of December 9, 2014, R.D.H. laid

4

the toddler in his crib and he began to cry. C.A.P. got up to care for him, but R.D.H. yelled at her to sit down. R.D.H. lifted the toddler by the neck and shoulder and began punching him in the chest to make him stop crying. When C.A.P. got up to help K.R.H., R.D.H. shrugged her off and threatened "shut the f-ck up and sit the f-ck down or you'll be next." R.D.H. punched K.R.H. approximately five times before throwing him back into the crib. R.D.H. kept C.A.P. from checking on K.R.H. When R.D.H. picked K.R.H. up again, C.A.P. noticed the child was not breathing.

A.R.M., the family's landlord, arrived home shortly after R.D.H. threw the toddler back into the crib. When C.A.P. and R.D.H. revealed that K.R.H. was not breathing, A.R.M. called police and attempted to revive him, to no avail. She reported to police that R.D.H. had been living there for approximately three weeks before that night. R.D.H. fled before police arrived.

C.A.P. reported that A.D.H. saw R.D.H. hitting K.R.H. and froze. She called a friend to care for A.D.H. while police investigated K.R.H.'s death. The friend reported that after she brought A.D.H. home with her, he threw up a brown-colored liquid. And, while changing his diaper, she discovered that he had healing bruises on his back. Believing that A.D.H. needed medical attention, she called the police, who took him to the hospital.

At North Memorial Medical Center, doctors observed that A.D.H. appeared stunned, quiet, and emaciated. A.D.H. had scabs, abrasions, scars, and a sub-acute contusion on his left lateral temporal forehead. He was weak, unable to hold weight, and nonverbal. Hospital notes stated that A.D.H.'s injuries, likely of different ages, were

5

consistent with child abuse. Doctors diagnosed him with "failure to thrive" and opined that he was acutely ill, which did not match the baseline reported by his mother.

After K.R.H.'s death, the Department filed a petition to terminate C.A.P. and R.D.H.'s parental rights to A.D.H., alleging egregious harm to both children. A.D.H. entered foster care and has since been diagnosed with a speech impediment and developmental delays.

At trial, the district court admitted 43 exhibits and heard testimony from the guardian ad litem, the child protection social worker involved with the July 2013 case, and the child protection social worker involved with the current case. The guardian ad litem and the current child protection social worker testified that termination was in A.D.H.'s best interest.

Following trial, the district court terminated the parental rights of C.A.P. and R.D.H. Based on the uncontroverted evidence of the manner of K.R.H.'s death, the district court found by clear and convincing evidence that he suffered egregious harm while in their care. And, though it was not necessary to its termination order, the district court additionally found by clear and convincing evidence that A.D.H. suffered egregious harm while in the parents' care, based on medical reports of his condition when hospitalized on December 10, 2014. Specifically, the district court found that C.A.P. knew of the grave danger that R.D.H. posed to the children, but that she repeatedly defied court orders by allowing him access to them. The district court concluded that it was contrary to A.D.H.'s best interests to remain in C.A.P.'s custody.

The district court denied C.A.P.'s motion for a new trial. She appeals.

Parental rights may be terminated only for "grave and weighty reasons." *In re P.T.*, 657 N.W.2d 577, 591 (Minn. App. 2003), *review denied* (Minn. Apr. 15, 2003) (quotation omitted). Termination is appropriate when clear and convincing evidence supports at least one statutory ground for termination and termination is in the best interests of the child. *In re Welfare of Children of S.E.P.*, 744 N.W.2d 381, 385 (Minn. 2008).

We review a district court's findings of the underlying facts of a case for "clear error, but we review its determination of whether a particular statutory basis for involuntarily terminating parental rights is present for an abuse of discretion." *In re Welfare of Children of J.R.B.,* 805 N.W.2d 895, 901 (Minn. App. 2011), *review denied* (Minn. Jan. 6, 2012); *see also In re Welfare of Child of R.D.L.,* 853 N.W.2d 127, 136 (Minn. 2014) (stating that "termination of parental rights is always discretionary with the juvenile court").

1.    *Egregious Harm*

Upon petition, the juvenile court may terminate all rights of a parent to a child if it finds that

> a child has experienced egregious harm in the parent's care which is of a nature, duration, or chronicity that indicates a lack of regard for the child's well-being, such that a reasonable person would believe it contrary to the best interest of the child or of any child to be in the parent's care.

Minn. Stat. § 260C.301, subd. 1(b)(6) (2014). Egregious harm is "the infliction of bodily harm to a child or neglect of a child which demonstrates a grossly inadequate ability to

provide minimally adequate parental care." *Id.* § 260C.007, subd. 14. When the subject parent has not personally inflicted egregious harm, the district court "must find that the parent either knew or should have known that the child had experienced egregious harm." *In re Welfare of Child of T.P.*, 747 N.W.2d 356, 362 (Minn. 2008).

C.A.P. argues that the evidence did not support the district court's finding of egregious harm to A.D.H., that any harm to him was attributable only to R.D.H., and that the district court improperly invoked the egregious harm provision to terminate her parental rights. She further argues that she is a victim of domestic abuse and that the district court unjustly assigned her responsibility for R.D.H.'s abusive presence in the home. We disagree.

C.A.P.'s argument overlooks precedential construction of the parental rights termination statute. The statute simply requires that a child experience egregious harm in the parent's care; it does not require that the child who is the subject of the petition suffer the egregious harm. Minn. Stat. § 260C.301, subd. 1(b)(6); *In re Welfare of A.L.F.*, 579 N.W.2d 152, 155–56 (Minn. App. 1998) (holding that parental rights may be terminated to *any* child in the home if another child in the parent's care has experienced egregious harm that shows the parent's "grossly inadequate ability to provide minimally adequate care"). Nor does the statute require that the parent whose rights are the subject of the petition inflict the harm. *See A.L.F.*, 579 N.W.2d at 155–56.

Here, clear and convincing evidence established that each child suffered egregious harm while in C.A.P.'s care. Uncontroverted evidence established that K.R.H. died from the injuries that R.D.H. inflicted, and this event was of such magnitude to show that a

8

reasonable person would believe it contrary to A.D.H.'s best interest to be in C.A.P.'s care. Even absent the tragic, violent abuse of his little brother, A.D.H.'s condition at the time—presenting signs of repeated physical abuse and severe malnourishment—further demonstrates that he had suffered egregious harm while in C.A.P.'s care.

The district court found that C.A.P. knew of the grave danger to the children if R.D.H. was allowed access to them, yet she repeatedly defied protective orders and allowed R.D.H. back into the family home. The district court emphasized that C.A.P. continued to maintain her relationship with the father despite the risk of grave harm to the children. The district court found that C.A.P.'s continued failure to protect the children, despite several major interventions by child protective services, shows that she is unable to provide A.D.H. adequate care.

We do not minimize C.A.P.'s personal struggle as a victim of R.D.H.'s domestic abuse. The record shows a long and violent history of persistent abuse throughout the parents' six-year relationship. But the record also shows that C.A.P. was offered services to help her protect herself and her children from R.D.H.'s attacks.

The former child protection social worker and the guardian ad litem testified that C.A.P. received domestic violence programming, psychological counseling, and a safety plan in the event that R.D.H. contacted her. Even with this help, C.A.P. did not provide a safe home for her children. The former child protection social worker and the guardian ad litem testified that C.A.P. concealed her continued contact with R.D.H. even while she was completing her case plan, despite opportunities to disclose the information in a safe environment. Moreover, though C.A.P. obtained an order for protection against R.D.H.

9

for herself and on behalf of the children in July 2013, she attempted, albeit unsuccessfully, to have it dismissed approximately one month before K.R.H. died. When K.R.H. died, R.D.H. had been living in the family home for approximately three weeks, despite the active order for protection. Finally, C.A.P. had reunited with R.D.H. even before that time; during the investigation she told police that she had lived with R.D.H. in Illinois for at least a month before he moved in with her in Minnesota.

The record contains ample and unequivocal support for the district court's findings. Clear and convincing evidence shows that the children's injuries demonstrate a grossly inadequate ability to provide minimally adequate parental care and a lack of regard for the child's well-being, so that a reasonable person would believe it contrary to the best interest of A.D.H. to be in C.A.P.'s care.

## 2.    *Best Interests*

After finding statutory grounds for termination, the district court must then determine whether termination is in the child's best interests. *In re Welfare of Children of R.W.*, 678 N.W.2d 49, 57 (Minn. 2004). The child's best interests must be the district court's "paramount consideration." Minn. Stat. § 260C.301, subd. 7.

In assessing the child's best interests, the court must analyze (1) the child's interest in preserving the parent-child relationship, (2) the parent's interests in preserving the parent-child relationship, and (3) any competing interests of the child. Minn. R. Juv. Prot. P. 39.05 subd. 3(b)(3). An order terminating parental rights must explain the district court's rationale for concluding that termination is in the child's best interests. *In re Tanghe*, 672 N.W.2d 623, 625 (Minn. App. 2003).

This court reviews a district court's ultimate determination that termination is in a child's best interest for abuse of discretion. *In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 905 (Minn. App. 2011), *review denied* (Minn. Jan. 6, 2012).

C.A.P. challenges the district court's finding that termination was in A.D.H.'s best interests. She argues that she was highly successful in completing her case plan, R.D.H.'s presence is no longer a concern because he will likely be incarcerated for life, and no evidence showed that she personally neglected or abused A.D.H. Her arguments are unpersuasive.

C.A.P. offers no legal support for her contentions, and the evidence supports the district court's finding. At trial, the child protection social worker testified that C.A.P. was not capable of keeping A.D.H. safe, had not provided him adequate nutrition, and did not comprehend the role that she played in the harm to her children. She stated that C.A.P. assigns sole responsibility to R.D.H., which leaves her powerless to actually make changes in her own life. She further testified that C.A.P. acknowledged her inability to protect the children, which raised concerns for her inability to protect A.D.H. in the future.

The guardian ad litem—who had been involved with the family since July 2013—testified that C.A.P. was incapable of prioritizing A.D.H.'s safety or "accepting a level of responsibility that would allow her to parent and keep the child safe." She stated that C.A.P.'s history of putting the children at risk raised grave concerns for A.D.H.'s safety in the future.

11

The district court agreed with the guardian ad litem and the child protection social worker that termination was in the child's best interests. Its order cited C.A.P.'s failure to protect A.D.H. in the past and the abuse and egregious harm that he suffered while in her care. Weighing the factors, the court found that the child's competing interest in safety, security, and appropriate care to meet his special needs dictates that it is in his best interests to terminate the parental rights of both parents.

We give great deference to the district court's ultimate determination of the child's best interests. *S.E.P.*, 744 N.W.2d at 385. In this case, the district court was particularly poised to consider the child's best interests given its experience with the family through their involvement with the county. Because the district court addressed the statutory best interest factors, explained its rationale, and the record supports its findings, it properly exercised its discretion in finding that termination was in A.D.H.'s best interests.

**Affirmed.**